UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOKESHA BELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18 CV 1154 DDN |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Jokesha Bell for child's disability insurance benefits and supplemental security income benefits (SSI) under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. § 401, *et seq*. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## I. BACKGROUND

Plaintiff Jokesha Bell, applied for Title II and Title XVI benefits on June 8, 2015, at the age of 18. (Tr. 181-200). She alleged that she became disabled beginning November 9, 1996, due to "understanding, SSD classes, asthma, and scoliosis." (Tr. 15,

---

[1] The Honorable Andrew M. Saul is now the Commissioner of Social Security. In that capacity, Mr. Saul is substituted as the defendant in this suit. Fed. R. Civ. P. 25(d). No further action needs to be taken to continue this suit. 42 U.S.C. § 405(g) (last sentence).

181, 197, 219). Plaintiff's application was initially denied in September 2015. (Tr. 100-13).

In September 2015, plaintiff requested a hearing before an ALJ. (Tr. 114-16). The ALJ heard testimony from plaintiff, plaintiff's grandmother, and a vocational expert in May 2017. (Tr. 30-66). In September 2017, the ALJ found that plaintiff was not disabled. (Tr. 15-25). Subsequently, in May 2017, the Appeals Council denied plaintiff's request for review. (Tr. 1-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner of Social Security.

## II. MEDICAL HISTORY

The following is a summary of plaintiff's medical history relevant to this appeal. Plaintiff was diagnosed with mild mental retardation as a child and received special education services in public schools. A Special Education Report from Jefferson County, Colorado, Public Schools, dated August 2005, contained a WISC-IV Test[2] with a performance score of 67, and a full-scale IQ of 65, with a verbal score of 65. (Tr. 306). A Woodstock-Johnson III test[3] was administered, with low results as well. (Tr. 310). The Report also referred to a December 2003 test, where plaintiff received a performance score of 74, a full-scale IQ of 64, and a verbal score of 58. (Tr. 306).

---

[2] "The WISC-IV measures a student's ability to succeed in a school setting. It consists of four basic segments, the Verbal scale (reasoning and problem solving involving language), the Performance scale (reasoning and problem solving involving more visual/manipulative information), the Working Memory scale (ability to store information in short-term memory and then manipulate it) and the Processing Speed scale (how quickly a student responds). These four segments have a variety of subtests that give us an idea of the student's cognitive strengths and weaknesses. When combined, these four segments make up what is referred to as global general intelligence (Full Scale score). The student's performance is then compared with those of the general population in their specific age group." (Tr. 306).

[3] This test provides a "comprehensive system for measuring general intellectual ability, specific cognitive abilities, scholastic aptitude, oral language, and achievement." (Tr. 309).

In December 2014, shortly after plaintiff turned 18, psychologist Paul Rexroat, Ph.D., found that plaintiff's IQ was significantly higher than the school testing had indicated, giving her a full-scale IQ score of 72. (Tr. 340-45). Dr. Rextroat also reviewed plaintiff's school records and previous IQ assessments. (Tr. 22-23, 340-41). He found that plaintiff could perform simple tasks and had only mild limitations interacting socially and adapting to her environment. (Tr. 344-45). Dr. Rexroat diagnosed borderline intelligence. (*Id.*).

In February 2015, Ms. Sonya Williams, M.A., a licensed professional counselor, completed a Service Plan, and assigned plaintiff a Children's Global Scale (C-GAS) score of 45[4] and a Global Assessment of Relational Functioning (GARF) score of 61[5]. (Tr. 441-42). In March and May of 2015, the same tests were administered again, and plaintiff scored 45 and 61, and 53 and 65, respectively. (Tr. 438-40, 443). Ms. Williams indicated that the C-GAS score increased to reflect an increase in plaintiff's overall level of family functioning, with improved self-esteem, self-perception, and self-care related activities. (Tr. 443). Accordingly, Ms. Williams assessed that plaintiff only had mild retardation and focused on treating plaintiff as a neglected child. (Tr. 23, 357-400, 438-39, 441).

In September 2015, Margaret Sullivan, Ph.D., a psychologist, reviewed the school records along with those of Dr. Rexroat, and similarly concluded that plaintiff could

---

[4] A C-GAS of 45 is indicative of moderate interference in functioning in most areas or severe impairment of functioning in one area. A C-GAS of 53 is indicative of a variable functioning with sporadic difficulties or symptoms in several but not all areas. *See* David Shaffer et al., *A Children's Global Assessment Scale (CGAS)*, 40 Archives of Gen. Psychiatry 11, 1228–31 (1983).

[5] An individual with a GARF score of between 61 and 60 may experience mild symptoms or some difficulty in social, occupational, or school functioning, but generally functions well. An individual with a GARF score of between 51 and 60 may experience moderate symptoms as well as difficulty functioning in social environments. As the GARF score decreases, symptoms and the severity of a mental health illness are more defined. *Diagnostic and Statistical Manual of Mental Disorders*, 814-15 (4th ed.).

perform simple tasks and adapt to changes in a setting that did not require frequent public contact. (Tr. 73-74, 76-81).

Plaintiff lives with her grandmother and some of her siblings. At the hearing before the ALJ, plaintiff's grandmother, Joyce Anne Collins, testified that plaintiff does not understand many things, and lacks independence. (Tr. 53-54). In a report through plaintiff's attorney, Ms. Collins also stated that plaintiff needs verbal directions for everything she does and lacks self-esteem. (Tr. 226). She reported that plaintiff has difficulty concentrating and completing tasks and keeps to herself most of the time. (Tr. 226). Plaintiff has a driver's permit. (*Id*.). However, Ms. Collins stated that plaintiff runs stop signs because she forgets to look and requires verbal reminders. (Tr. 226).

After graduating high school, plaintiff obtained a job as a bagger in a supermarket, working six- to eight-hour shifts, three to four days per week. (Tr. 39, 56, 63). Plaintiff testified that a job coach assisted her with employment. (Tr. 20-22). Plaintiff also stated that she retained the ability to help care for her younger siblings, maintain her own personal care, prepare meals, clean, vacuum, do laundry, drive, shop, watch television, use the internet, and spend time with her family. (Tr. 36, 42-43, 45-48, 227-30, 235).

## IV. DECISION OF THE ALJ

At Step One, the ALJ found that plaintiff has never engaged in substantial gainful employment. 20 C.F.R. §§ 404.1571 *et seq*., 416.971 *et seq*. Although plaintiff has been employed as a bagger since 2016, that work does not rise to the level of substantial gainful activity because it is part-time. (Tr. 17-18).

At Step Two, the ALJ found that plaintiff had the severe impairment of borderline intellectual functioning. (Tr. 18). Although plaintiff has asthma and scoliosis, an August 2015 consultative evaluation revealed that they only cause her minimal limitations and are therefore not severe. (*Id*.).

At Step Three, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets or equals any listed impairment. (Tr. 18-21). The ALJ specifically considered Listing 12.05 for intellectual functioning, 20 C.F.R. pt. 404,

subpt. P, app. 1 § 12.05, and found that plaintiff's impairments do not meet this listing. (Tr. 18-21).

The ALJ found that plaintiff failed parts one and two of 12.05A. First, Dr. Rexroat conducted an IQ test on December 9, 2014, and plaintiff participated. (Exhibit 2F). Second, plaintiff testified that she would assist with the feeding of her younger brother and get him ready for school, and she had no issues with her personal care. (Tr. 19). She also testified that she cooks, does laundry, vacuums, cleans and shops for groceries with her grandmother. (*Id.*). The plaintiff also works part-time. (*Id.*). The capacity for these activities is inconsistent with a dependency on others for personal needs. (*Id.*).

The ALJ found, regarding §12.05B(2)(a), that plaintiff had only a moderate limitation in her ability to understand, remember, and apply information. (Tr. 19). Plaintiff testified that she did not need any help taking medication. (Tr. 20). When Dr. Rexroat examined her in 2014, he noted that plaintiff could understand and remember simple instructions and sustain concentration and persistence with simple tasks. (*Id.*). Regarding 12.05(2)(b), the ALJ found that plaintiff only had a moderate limitation in her ability to interact with others. (*Id.*). The record states that aside for some typical juvenile misbehavior in school, plaintiff gets along well with authority figures, shops at stores, and interacts with her grandmother and sisters. (*Id.*). Due to plaintiff's shyness and social isolation, plaintiff has moderate social limitations. (*Id.*).

Regarding §12.05B(2)(c), the ALJ found that plaintiff had a moderate limitation in her ability to concentrate, persist, or maintain pace. This was based on her IQ scores and a December 2014 psychological evaluation noting that her speech was coherent and showed no signs of a thought disorder. (*Id.*). Furthermore, plaintiff was able to follow simple instructions. (*Id.*). Finally, the ALJ concluded regarding 12.05B(2)(d) that plaintiff only had a moderate limitation. (*Id.*). Plaintiff testified that she would assist with feeding her younger brother and getting him ready for school, and she had no issues with her personal care. (*Id.*). During the December 2014 psychological evaluation, plaintiff stated she was capable of cleaning dishes, folding clothes, cleaning her room, heating food in the microwave, cooking food on the stove, and doing laundry. (*Id.*). She was able

5

to work part-time as well. (*Id.*). The ALJ concluded that the fact that plaintiff was capable of all these activities demonstrated only a mild limitation with adapting and managing herself. (*Id.*). The ALJ gave little weight to the assessment of psychologist Sonya Williams, because "it is a one-time opinion offered by a non-acceptable medical source." (Tr. 23).

The ALJ determined plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the plaintiff can never work at unprotected heights and never with moving mechanical parts; is limited to performing simple, routine and repetitive tasks and making simple work-related decisions; and can frequently respond appropriately to supervisors, frequently respond appropriately to coworkers, and frequently respond appropriately to the public. (Tr. 21).

At Step Four, the ALJ found that plaintiff had not received income from work that equaled or exceeded the regulatory amount for substantial gainful activity. So, there was no past relevant work to consider. (*Id.*). Finally, regarding Step Five, the ALJ determined that plaintiff retained the RFC to perform work at all exertional levels but must never work at unprotected heights or with moving mechanical parts. (*Id.*). Plaintiff was found to be capable of performing a range of simple work with frequent interaction with others. (*Id.*). The vocational expert testified that such an individual could perform work existing in significant numbers in the national economy: as a bagger, a housekeeping cleaner, or an usher. (Tr. 21, 24, 64). There were 125,945; 134,614; and 5,158 of these jobs respectively in the national economy. (Tr. 24). In fact, consistent with this testimony, the plaintiff worked at the time as a bagger. (Tr. 39, 56, 63).

Accordingly, the ALJ found that plaintiff was not entitled to benefits on a Child's Insurance Benefits Application or through Supplemental Security Income. (Tr. 25).

## V. GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and

are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Id*. As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least 12 continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii), 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. *Pate-Fires*, 564 F.3d at 942. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five. *Id*. At this final step, the Commissioner considers the claimant's RFC in conjunction with her age, education, and work experience to determine

7

if the claimant retains the requisite RFC to perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## VI. DISCUSSION

Plaintiff claims that the ALJ failed to properly consider the third-party evidence of record. In particular, plaintiff argues that the ALJ failed to follow Social Security Ruling 16-3p when she evaluated the statements of plaintiff's mental health counselor and her grandmother. (Doc. 19 at 5).

### A. Social Security Ruling 16-3p

Social Security Ruling 16-3p requires the Commissioner to consider all of the evidence in a claimant's record when evaluating the intensity and persistence of that individual's claimed symptoms. SSR 16-3p. Evaluating these symptoms involves a two-pronged analysis. First, the Commissioner determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. *Id*. In determining whether there is an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms, the Commissioner does not consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence. *Id*.

Second, the Commissioner evaluates the intensity and persistence of an individual's symptoms, such as pain, and determines the extent to which an individual's symptoms limit her ability to perform work-related activities for an adult, or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a Title XVI disability claim. *Id*. In considering the intensity, persistence, and limiting effects of an individual's symptoms, the Commissioner examines the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record. *Id*.

Plaintiff claims that once a diagnosis has been rendered, both acceptable and non-acceptable medical sources must be considered. Accordingly, plaintiff argues that at Step Two of the analysis in this case, once the ALJ accepted plaintiff's borderline intellectual functioning diagnosis, the ALJ failed to properly consider third-party evidence, and as a result, the ALJ's determination of plaintiff's RFC is not in accord with the Commissioner's standards. In particular, plaintiff argues that the ALJ erred in discounting the opinions of licensed professional counselor Sonya Williams and plaintiff's grandmother, Joyce Ann Collins. *Id.* The Court disagrees.

**B. Medical Evidence**

Plaintiff argues that the ALJ failed to properly evaluate the medical opinions of the record, particularly with respect to Counselor Williams' opinions. In February 2015, Ms. Williams assigned plaintiff a C-GAS score of 45 and a GARF score of 61. (Tr. 441-42). In March and May of the same year, plaintiff repeated these tests, scoring a 53 and 65, respectively. (Tr. 438-40, 443). Ms. Williams indicated that the C-GAS score increased to reflect an increase in plaintiff's overall level of family functioning, with improved self-esteem, self-perception, and self-care related activities. (Tr. 443). Accordingly, Ms. Williams assessed that plaintiff had only mild retardation and focused on treating plaintiff as a neglected child. (Tr. 357-400, 438-39, 441).

The ALJ properly gave little weight to the February 2015 score, because only three months later, Ms. Williams observed that plaintiff's symptoms had improved, with her C-GAS score increasing to 53 and the GARF score to 65. (Tr. 443). While plaintiff argues that the opinion of a treating physician is entitled to great weight, *Ghant v. Bowen*, 930 F.2d 633, 639 (8th Cir. 1991), Ms. Williams is not a treating physician.[6] Moreover, Ms. Williams herself stated that plaintiff's symptoms had improved.

---

[6] The ALJ lawfully concluded that Ms. Williams was not an "acceptable medical source." (Tr. 23). *See* 20 C.F.R. §§ 404.1502(a), 416.902(a) (2017). The regulations limit "acceptable medical sources" to the following: licensed physicians, psychologists,

The ALJ also noted that Ms. Williams did not give plaintiff ongoing treatment for more than a year. (Tr. 23). *See* 20 C.F.R §§ 404.1502(a), 416.902(a) (2017). Ms. Williams began seeing plaintiff in August 2014 and discharged her in July 2015, after plaintiff achieved all of her treatment goals. (Tr. 445). Accordingly, the ALJ lawfully discounted Ms. Williams' February opinion. In any case, Ms. Williams did not identify any specific work-related limitations that contradicted the specific work-related limitations in the ALJ's RFC finding. (*Id.*).

Plaintiff also argues that the other medical opinions given great weight by the ALJ were only a "consultative evaluation" by specialist Dr. Rexroat and non-examining record review by Dr. Sullivan. While an RFC may not be formulated on the basis of non-examining physician opinions alone, the opinion of a consulting medical expert may constitute substantial evidence to support an RFC determination. *See Hensley v. Colvin,* 829 F.3d 926, 929 (8th Cir. July 18, 2016) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. However, there is no requirement that an RFC finding be supported by a specific medical opinion."); *see also Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming the ALJ's RFC without medical opinion evidence).

Dr. Rexroat examined plaintiff and found she had few limitations in her activities of daily living and only mild limitations on her social functioning, with serious

---

optometrists, podiatrists, speech-language pathologists, audiologists, advanced practice nurses for impairments within their licensed scope of practice, and physician assistants for impairments within their licensed scope of practice. *Id*. Ms. Williams is a licensed professional counselor, which does not fall into any of the listed categories. Nor does plaintiff argue that Ms. Williams is in fact an acceptable medical source. An ALJ may not discount medical evidence merely because it is not from an acceptable medical source, *see Shontos v. Barnhart,* 328 F.3d 418, 426 (8th Cir. 2003), but is one of many factors that may be considered when determining the weight to give a medical opinion. *See* 20 C.F.R. §§ 404.1527(c)(1)-(6); 416.927(c)(1)-(6).

limitations in her school functioning. Dr. Sullivan, while she did not examine plaintiff, reached a similar conclusion.

The ALJ's weighting of the medical opinions is supported by substantial evidence. Ms. Williams stated that plaintiff's symptoms had improved after applying the same test just three months later. The ALJ could properly discount Ms. William's first test, which was inconsistent with the opinions of Dr. Sullivan and Dr. Rexroat. And the ALJ could lawfully give the opinions of Dr. Sullivan and Dr. Rexroat great weight, as they are supported by substantial evidence in the record of plaintiff's physical and social abilities.

**C. Other Evidence**

Second, plaintiff claims that the ALJ failed to consider the testimony of non-medical evidence, including the statements of her grandmother. She testified that plaintiff does not understand things "[m]ost of the time" and that she cannot think for herself. (Tr. 54). However, it is clear from the decision that the ALJ in fact considered the testimony of Ms. Collins, but found it was inconsistent with the medical opinions of both Dr. Rexroat and Ms. Sullivan, as well as inconsistent with plaintiff's ongoing work activity and activities of daily living. (Tr. 19-23). The ALJ described plaintiff's capacity for daily activities and concluded that capacity "underscores an ability beyond that to which the claimant and her grandmother testified existed." (Tr. 23). Plaintiff is able to do dishes, fold clothes, clean her room, use a microwave and stove, do laundry, drive with someone else in the car, vacuum, clean, and shop for groceries with her grandmother. She gets along well with her family members, takes no medication, and uses the internet for social activity. (*Id*.). She also works shifts of four to six hours as a grocery store bagger four times per week. (Tr. 34-67). She takes public transportation to work. (Tr. 42).

The ALJ properly considered the school's records as well (Tr. 22, 263, 326). The ALJ noted that the school's records showed plaintiff's symptoms had improved, and that plaintiff increased her attendance in regular classes over the course of her Individualized

11

Education Plan, so that she was attending regular educational classes instead of special education classes 80 percent of the time. (Tr. 22, 271, 289).

With regard to plaintiff's use of a job coach, the ALJ emphasized that plaintiff worked six- to eight-hour shifts, three to four days per week, but only met with the job coach once a week for a "quick" check-in. (Tr. 39, 52, 56, 63). The job coach was only present for a fraction of plaintiff's work activity, and there is no indication that plaintiff had difficulty working when the job coach was absent. Consistent with this work activity, the Vocational Expert testified that an individual with plaintiff's limitations could perform this same job. (Tr. 64).

As long as substantial evidence supports the ALJ's decision, the Court may not reverse its decision merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier*, 294 F.3d at 1022. In this case, the ALJ properly reviewed the medical evidence and all other evidence of record in determining plaintiff's RFC, and substantial evidence supports that determination. (Tr. 19, 20-23).

## VII. CONCLUSION

For the reasons set forth above, the Court concludes that the Commissioner's final decision that plaintiff is not disabled is supported by substantial evidence on the record as a whole. The decision of the Commissioner is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 2, 2019.